# COURT OF APPEALS OF VIRGINIA

## Record No. 1076-25-2

JOHNATHAN ORLANDO JACKSON

v.

COMMONWEALTH OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Athey

Argued by videoconference

Opinion Issued August 11, 2026

### FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Claire G. Cardwell, Judge

Gregory R. Sheldon (Bain Sheldon, on brief), for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

### PUBLISHED OPINION BY
### <u>JUDGE RANDOLPH A. BEALES</u>

Johnathan Orlando Jackson appeals his convictions for first degree murder and use of a firearm during the commission of a felony. He argues that the trial court erred in failing to strike a juror for cause after she stated that she had been the victim of a crime. He also alleges that the trial court erred in failing to grant a mistrial after a witness briefly mentioned an altercation, which the trial court had previously ruled was inadmissible. He also argues that the evidence was insufficient to support a finding of premeditation necessary to support the jury's conviction for first degree murder. Finally, he assigns error to the trial court's denial of his requested jury instructions on heat of passion, voluntary manslaughter, and self-defense.

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

For a few months between 2023 and 2024, Jackson worked in the café at the Virginia Commonwealth University Children's Hospital of Richmond. The employees of the café did not have a break room where they could smoke, so they went outside to a bus stop to smoke.

On March 7, 2024, Jackson got into a physical altercation with a coworker. The following day, March 8, 2024, at approximately 6:15 a.m., Jackson's supervisor at the café, David Thomas, spoke with Jackson on the phone to tell him not to come to work that day because he had been terminated. According to the Commonwealth, during this phone call, Jackson "became angry, said that he had a gun, made threats to kill the supervisor and said that the supervisor would be seeing him."

Shortly after this phone call, at around 6:40 a.m., Jackson left his apartment on foot. Jackson was wearing a hood, a mask, and sunglasses—with his face almost completely concealed. Jackson walked through downtown Richmond, circled the hospital, and stopped at the bus stop at approximately 7:39 a.m.

Video footage from the bus stop showed that the victim, Vincent Robinson, Jr., arrived at the bus stop about one minute after Jackson. Jackson's head was turned towards Robinson as Robinson approached the bus stop. As Robinson walked towards Jackson, he was holding his cell phone in his right hand. Robinson initially walked past Jackson before turning toward him.

---

[2] On appeal, "we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).
However, "[w]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction," in this case, Jackson. *Fahringer v. Commonwealth*, 70 Va. App. 208, 211-12 (2019) (quoting *Williams v. Commonwealth*, 64 Va. App. 240, 244 (2015)).

Due to the angle of the camera, the video's lack of sound, and because Jackson's mouth was concealed by his mask, it is impossible to tell who spoke to whom first. Jackson and Robinson spoke for a few moments. As they spoke, Jackson's right hand moved from his pocket to the waistband of his pants. He grabbed hold of a firearm without pulling it out of his waistband, and kept his hand there for a moment. Jackson then actually pulled the firearm out of his waistband and held it by his side for another moment as Robinson was putting his phone in his pants pocket. Jackson then raised the firearm to point it at Robinson, who immediately slapped it away with an open palm. Jackson then re-aimed the firearm at Robinson and shot him in the chest. Robinson fell to the ground, and Jackson paused for a moment to watch Robinson fall, before walking away, tucking the firearm back into his waistband. From when Robinson turned towards Jackson to when Jackson shot Robinson and walked away, the entire incident lasted only about 17 seconds. Robinson died from his injuries an hour later.

After walking away from the bus stop, Jackson walked back to his apartment. There, he disposed of the gun and his clothes in his apartment building's trash room.

On March 20, 2024, police interviewed Jackson. Jackson first denied knowing anything about a homicide. He then admitted to having acted in self-defense. Jackson alleged that Robinson "said goofy ass shit requesting money." When a detective asked Jackson, "Do you feel sorry about what happened?" Jackson shook his head and responded, "I don't feel sorry for criminals." Jackson was indicted for first degree murder and use of a firearm in the commission of a felony.

Before trial, the Commonwealth moved in limine to admit evidence of the altercation between Jackson and his coworker on March 7, 2024, and the threats he made in the phone call with Thomas on March 8, 2024. At a hearing on the motion, the trial judge stated, "[I]t's

- 3 -

probably permissible for you to prove that he was terminated" but "beyond that, I think it's way to[o] prejudicial." The trial court denied the motion.

The parties proceeded to trial. During voir dire, the circuit court asked the venire, "Have any of you expressed or formed any opinions about the guilt or innocence of this defendant?" All of the veniremen responded, "No." The circuit court then asked, "Are any of you aware of any bias or prejudice you might have against the Commonwealth of Virginia or the defendant?" Again, all of the veniremen responded, "No."

The Commonwealth then asked the venire, "Does anyone have any experiences in their past, or with friends or family, that would make it such that you would be unable to listen to evidence of a violent crime like murder?" Juror 12 did not respond to this question. Counsel for Jackson then asked, "[H]as anybody been the victim of a crime, or had a family member be the victim of a crime at any point?" However, Juror 12 responded, "I was, like, attacked before." She indicated that she preferred to speak about this incident privately.

Outside of open court, the following exchange with Juror 12 occurred:

| Juror Number 12: | So, I mean, there's been, like, a couple of different instances where I feel like it could skew my view of things. I do still think that, like, you know, guns are okay and everything, but I have had, you know, like, a gun to my head, and, you know -- so -- yeah. And I have been to trial before. It was actually for a different instance. It was I witnessed someone pull a gun on someone else. And so and -- you know, proceeded to, like, attack them. It was like a malicious wounding case. So I don't know. I just figured you guys should know that. |
| --- | --- |
| Counsel for Jackson: | Do you think that might affect your ability to listen and be fair? |
| Juror Number 12: | I, I don't think so. Like, I feel like I could be impartial. But I figured you guys would want to know that. |

- 4 -

| | |
|---|---|
| Commonwealth: | No questions. |
| The Court: | Motion? |
| Counsel for Jackson: | Judge, I'll make the motion for the record. She said [she] "feels like she could be impartial." |
| | . . . . |
| | Judge, can I just put on the record Juror 12? |
| The Court: | Yes. Were you making a motion? |
| Counsel for Jackson: | Yeah. I'm sorry, Judge. I hate doing it. I just feel like she equivocated. She said it could skew her view of things. It's hard to say. She's had a gun to her head before. And served [sic] on a violent crime. She feels like she could be impartial. So I think there has been back-and-forth equivocation. |
| The Court: | She also offered a couple of times that she just though[t] we ought to know. |
| Counsel for Jackson: | Right. |
| The Court: | Which, to me, sounded like the reason she brought it to our attention, not that she thought it disqualified her. Do you want to respond? |
| Commonwealth: | Judge, I think she said she -- I think, as any witness might knowing that they haven't seen the evidence -- but otherwise that she would be fair and impartial. And, again, that she was trying to, in all candor, make sure that everybody has all the information. |
| The Court: | All right. That objection is overruled. |

Counsel for Jackson then used a peremptory strike on Juror 12.

The Commonwealth then began its presentation of evidence, calling David Thomas, Jackson's supervisor, as a witness. He identified Jackson and confirmed that he worked in the

- 5 -

café at the hospital.  He testified that employees used the bus stop to smoke.  He testified that he called Jackson early in the morning of March 8, 2024:

| Commonwealth: | Now, on the morning of March 8th around 6:15 or 6:20 that morning, did you speak with the defendant over the phone? |
| --- | --- |
| Thomas: | Yes. |
| Commonwealth: | What, if anything, did you tell him about whether he was allowed to come to work that day? |
| Thomas: | I told him he couldn't come to work that day. |
| Commonwealth: | Had he called asking if he could come to work? |
| Thomas: | Yeah. |
| Commonwealth: | All right.  At some point during the conversation when you told defendant that he could not come to work that day, did you give him your opinion on whether he would ever be coming back to work at the Children's Hospital? |
| Thomas: | Yeah. |
| Commonwealth: | And what did you tell [him]? |
| Thomas: | I told him that it was, like, a corporate place, and the incident that happened probably didn't look good.  And there was, like, an altercation, so -- |

The Commonwealth then cut him off, asking him another question before he could continue.

Thomas was excused, and counsel for Jackson asked to make a motion outside the presence of

the jury.  He moved for a mistrial based on Thomas's references to "the incident that happened."

The court denied Jackson's motion because Thomas's reference to "the incident" was inadvertent

and did not allude to the physical nature of the altercation. The court instead issued the following curative instruction to the jury:

> Ladies and gentlemen, the witness -- the previous witness made reference to an incident, and thereafter, the defendant was not permitted to come back to work. It's very important that you not consider that reference to an incident, not be worried about what it was. It has nothing to do with the case, and it's not relevant. So this is one of those times where I have to ask you to disregard what you heard, and not consider that in any way.

Jackson then testified in his own defense. He testified that he left his house around 6:45 a.m. to catch a bus to the grocery store, but acknowledged that the bus was not scheduled to come until 8:40 a.m. Jackson explained that he was wearing a hood and mask because of the cold.

He testified that as Robinson approached him, Robinson yelled, "What the F are you looking at." Jackson testified that he believed he saw Robinson with a knife, but that he now understood the object to be a cell phone. Jackson also testified that Robinson said, "You look like you got some money. Go ahead and give that up for me." Jackson alleged that Robinson became more aggressive, saying, "Give it up or I'm going to do it to you." Jackson then said he withdrew his firearm to get Robinson away from him. When Robinson hit the firearm away, Jackson testified that he thought Robinson had stabbed him, and so he shot Robinson. He testified that he was carrying his firearm for protection and was not trying to kill Robinson.

On cross-examination, the Commonwealth questioned Jackson about where he worked after he was terminated from Children's Hospital. He testified that he had been hired at a new establishment and that on "[t]he date of the incident at VCU, I already had put applications in." Counsel for Jackson did not object to Jackson's reference to "the incident at VCU."

At the close of the evidence, the parties introduced their preferred jury instructions. Jackson requested "an instruction down to voluntary manslaughter, as well as heat of passion, as well as self-defense." Jackson's proposed self-defense instruction stated:

> If you believe that the defendant was without fault in provoking or bringing on the fight, and you further believe that:
>
> (1) He reasonably feared, under the circumstances as they appeared to him, that he was in imminent danger of being killed or that he was in imminent danger of great bodily harm; and
>
> (2) He used no more force, under the circumstances as they appeared to him, than was reasonably necessary to protect himself from the perceived harm,
>
> then the killing was in self-defense, and you shall find the defendant not guilty.

The trial court rejected Jackson's instructions, finding that "the record does not contain sufficient evidence to support giving of the heat of passion instruction or self-defense instruction." The trial judge stated, "[I]n viewing the defendant's testimony in conjunction with the video of the actual shooting in this case, I do not find that there was sufficient -- a sufficient or a scintilla of evidence -- of credible evidence to support the giving of either instruction."

The jury found Jackson guilty of first-degree murder and use of a firearm in the commission of a felony. The trial court sentenced him to 63 years of incarceration.

ANALYSIS

I. Juror 12's Impartiality

In his first assignment of error, Jackson argues, "The trial court erred by denying Jackson's motion to strike juror number 12, where there was a reasonable doubt as to her ability to be fair and impartial based upon the equivocation in juror number 12's answers to questions."

An accused has a constitutional right to an impartial jury—a right guaranteed by both the United States Constitution and the Virginia Constitution. *See* U.S. Const. amend. VI; Va. Const.

- 8 -

art. I, § 8. "The opinion entertained by a juror, which disqualifies him, is an opinion of that *fixed character* which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011) (emphasis in original) (quoting *Justus v. Commonwealth*, 220 Va. 971, 976 (1980)). "Thus, 'the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.'" *Id.* (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000)).

"The existence of an individual juror's possible bias or partiality is a question of fact to be determined by the trial court." *Perez v. Commonwealth*, 40 Va. App. 648, 655 (2003) (citing *Watkins v. Commonwealth*, 229 Va. 469, 480 (1985)). "An appellate court must give deference to a trial court's factual finding regarding a juror's impartiality because the trial court 'sees and hears the juror.'" *Blevins v. Commonwealth*, 267 Va. 291, 297 (2004) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)). The trial court is in "a superior position to determine whether a prospective juror's responses . . . indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath." *Lovos-Rivas*, 58 Va. App. at 61 (quoting *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005)). "Indeed, '[t]he living record contains many guideposts to the truth which are not in the printed record,' and an appellate court, not having the benefit of these guideposts, 'should give great weight to the conclusions of those who have seen and heard them.'" *Dalton v. Commonwealth*, 64 Va. App. 512, 526 (2015) (alteration in original) (quoting *Bradley v. Commonwealth*, 196 Va. 1126, 1136 (1955)). Therefore, a trial court's finding with respect to juror impartiality will be reversed "only upon a showing of manifest error." *Blevins*, 267 Va. at 297 (quoting *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)).

On brief to this Court, Jackson cites to *Brown v. Commonwealth*, 29 Va. App. 199, 208 (1999), as support for his position that Juror 12's responses being "equivocal in nature" raised "doubt as to whether she would be able to render a fair verdict." That case is clearly distinguishable. In *Brown*, the prospective juror "expressed numerous reservations about her ability to serve impartially on the jury in light of her personal experiences. Nearly all of [her] responses contained the phrases, 'I think,' 'I don't know,' and 'I would try.'" *Id.* The juror was questioned at length by the attorney for the Commonwealth, the defendant's counsel, and the circuit court. *Id.* at 203-06. When asked in *Brown* if her experience of having been a victim of a similar crime would make her biased, she responded, "I don't honestly know. I would hope not." *Id.* at 204. When asked if she could keep an open mind and decide the case based solely on the evidence, she responded, "We would all try to do that." *Id.* When asked if she could set aside her personal experiences, she responded, "I don't know how to answer other than I have -- I think that I would. I would do my best to." *Id.* at 205. And she concluded, "I would hope that I would do my duty and really look at the evidence." *Id.* Ultimately, this Court held that the circuit court's failure to strike this juror for cause was error because "[h]er responses indicated a great degree of equivocation and created reasonable doubt about her fitness as a juror." *Id.* at 208.

However, we simply cannot say that Juror 12's responses in the case now before us "indicated *a great degree of equivocation* and created reasonable doubt about her fitness as a juror." *Id.* (emphasis added). During voir dire, Juror 12 stated that there had been "a couple of different instances where I feel like it could skew my view of things. I do still think that, like, you know, guns are okay and everything, but I have had, you know, like, a gun to my head." She also stated, "I witnessed someone pull a gun on someone else," which ended in "a malicious wounding." When asked by defense counsel if her experience would "affect your ability to listen

- 10 -

and be fair?" she responded, "I don't think so. Like, I feel like I could be impartial. But I figured you guys would want to know that." The trial court, in denying Jackson's motion to strike Juror 12, stated, "She also offered a couple of times that she just though[t] we ought to know . . . [w]hich, to me, sounded like the reason she brought it to our attention, not that she thought it disqualified her."

Juror 12's responses indicate nowhere near the same level of equivocation as the prospective juror in *Brown*. The colloquy in *Brown* was significantly longer and featured much more pointed questions than those posed to Juror 12 in the case now before this Court. 29 Va. App. at 203-06. Although Juror 12 stated that she felt that her personal experiences could "skew my view of things," she also stated that she felt that she could be impartial. We simply cannot say that Juror 12's statement—"I feel like I could be impartial"—evinces the same extreme level of equivocation found in *Brown* of (1) "I don't honestly know. I would hope not"; (2) "We would all try to do that"; (3) "I don't know how to answer other than I have -- I think that I would. I would do my best to"; and (4) "I would hope I would do my duty and really look at the evidence." *Id.* at 204-05.

We also note that the trial court—and not this Court—was in the superior position to assess Juror 12's ability to be impartial. The "guideposts to the truth which are not in the printed record," like the juror's voice inflection, body language, and facial expressions, were witnessed and weighed by the trial court. *Dalton*, 64 Va. App. at 526 (quoting *Bradley*, 196 Va. at 1136).

Moreover, "[a] manifest error occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion." *Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017) (citing *Briley v. Commonwealth*, 222 Va. 180, 187 (1981)). However, the record here shows no such manifest error. Juror 12 stated that her experience would not affect her ability to be fair and that "I feel like I could be impartial." These concerns were not

- 11 -

ones that the record indicates she could not lay aside. In fact, the record shows that she raised these concerns to alert the parties and the court because "I figured you guys would want to know that." In short, the record does not reflect a great degree of equivocation by Juror 12 that created reasonable doubt about her fitness to serve as a juror, and we therefore cannot say that the trial court erred when it denied Jackson's motion to strike Juror 12 for cause.

## II. David Thomas's Testimony About "The Incident"

In his second assignment of error, Jackson argues, "The trial court erred by denying Jackson's motion for a mistrial where a witness referenced an altercation which the trial court had previously ruled inadmissible."

When a party moves for a mistrial, the trial court must determine, "in the light of all the circumstances of the case, whether the defendant's rights h[ave] been so indelibly prejudiced as to require a new trial." *Castillo v. Commonwealth*, 70 Va. App. 394, 445 (2019) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 589 (1983)). "The decision whether to grant a mistrial motion is a matter submitted to the circuit court's sound discretion," and we will not disturb such a decision on appeal unless it was erroneous as a matter of law. *Id.* (quoting *Lewis v. Commonwealth*, 269 Va. 209, 213 (2005)).

The admission of inadmissible evidence can be cured by the trial court "immediately instructing the jury to disregard that evidence." *Terry v. Commonwealth*, 5 Va. App. 167, 168-69 (1987) (citing *LeVasseur*, 225 Va. at 589). "A jury is presumed to follow a cautionary instruction to disregard evidence." *Jones v. Commonwealth*, 71 Va. App. 70, 92 (2019) (citing *Harris v. Commonwealth*, 19 Va. App. 518, 521 (1995)).

During Thomas's testimony, he referred to "the incident that happened" at Children's Hospital and that "there was, like, an altercation," despite the trial court holding this subject to be inadmissible prior to trial. The attorney for the Commonwealth cut Thomas off with another

- 12 -

question on a different topic before the witness Thomas could continue. "Incident" and "altercation" can refer to a wide range of conduct, and Thomas went into no further detail about what kind of conduct he was describing.[3] We can hardly say that this brief and vague reference to an unidentified incident or altercation was "so prejudicial that it 'probably remained on the minds of the jury and influenced their verdict.'" *Beavers v. Commonwealth*, 245 Va. 268, 280 (1993) (quoting *Asbury v. Commonwealth*, 211 Va. 101, 104 (1970)).

Furthermore, any error attributable to Thomas's reference here to an altercation or incident was cured with a cautionary instruction. The trial court, when ruling on Jackson's motion for a mistrial, stated that "[i]t was clear it was inadvertent on the Commonwealth's part," and "I don't think that there was any mention of a physical altercation." The trial court then issued a rather comprehensive curative instruction:

> Ladies and gentlemen, the witness -- the previous witness made reference to an incident, and thereafter, the defendant was not permitted to come back to work. It's very important that you not consider that reference to an incident, not be worried about what it was. It has nothing to do with the case, and it's not relevant. So this is one of those times where I have to ask you to disregard what you heard, and not consider that in any way.[4]

We therefore find that both the denial of the motion for a mistrial and the issuance of a curative instruction were decisions that did not abuse the trial court's discretion.

---

[3] "Incident" is defined as "[a] discrete occurrence or happening; an event, esp. one that is unusual, important, or violent." *Incident*, *Black's Law Dictionary* (12th ed. 2024). "Altercation" is defined as "[a] vehement dispute; a noisy argument." *Altercation*, *Black's Law Dictionary* (12th ed. 2024).

[4] We find it to be of no real importance that the trial court's curative instruction referred only to an "incident," when Thomas's testimony had referred to an "incident" and an "altercation." The record shows that these terms were used basically interchangeably.

- 13 -

III.  Sufficiency of the Evidence of Premeditation

In his third assignment of error, Jackson argues, "The trial court erred by finding there was sufficient evidence to prove the essential element of premeditation, an essential element of first-degree murder, beyond a reasonable doubt."

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

First degree murder is the "willful, deliberate, and premeditated killing" of another.  Code § 18.2-32.  "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674

(2021) (alteration in original) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). The reasoning process need not be lengthy; the specific intent to kill "may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Rhodes*, 238 Va. at 485 (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980)).

"Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Fields*, 73 Va. App. at 674 (alterations in original) (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004)). "In deciding [whether premeditation and deliberation exist], the jury may properly consider the brutality of the attack, . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (first alteration in original) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)).

There is ample evidence in the record to support the jury's conclusion that Jackson acted with premeditation. The video from the bus stop indicates that Robinson approached the bus stop and talked with Jackson for a few moments. Jackson then drew the weapon from his waistband and held it at his side for a moment. Then, he pointed the gun at Robinson, who pushed it away, and Jackson then raised the gun a second time and shot Robinson in the chest at point-blank range. At the moment that Jackson shot him, Robinson had nothing in his hands, and his arms were raised. Jackson then paused for a moment and watched as Robinson fell backwards and to the ground before walking away. Jackson then walked back to his apartment and disposed of his clothes and the weapon. Finally, Jackson clearly demonstrated a lack of remorse. In an interview with police, Jackson was asked, "Do you feel sorry about what happened?" and Jackson shook his head and responded, "I don't feel sorry for criminals." This

Court thus cannot say that the finding that premeditation existed here was plainly wrong or without sufficient evidence to support it.

## IV. Jury Instructions

In his fourth assignment of error, Jackson argues, "The trial court erred by denying Jackson's requests for instructions on heat of passion, voluntary manslaughter, and self-defense, as more than a mere scintilla of evidence existed to support such instructions."

In *Fahringer v. Commonwealth*, 70 Va. App. 208 (2019), this Court stated, "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* at 211 (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). In *Pena Pinedo v. Commonwealth*, 300 Va. 116 (2021), the Supreme Court likewise stated that its "sole responsibility in reviewing [jury instructions] is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Id.* at 121 (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)).

A party is entitled to have the jury instructed on his theory of the case provided that the instruction is "supported by 'more than a scintilla' of evidence." *Fahringer*, 70 Va. App. at 211 (quoting *Graves v. Commonwealth*, 65 Va. App. 702, 708 (2016)). A defendant's own testimony "may amount to more than a scintilla of evidence when viewed in a vacuum, but it pales to no more than a scintilla when viewed in light of the other undisputed evidence at trial." *Brandau v. Commonwealth*, 16 Va. App. 408, 413 (1993).

### A. *Heat of Passion and Voluntary Manslaughter*

Jackson argues that "the trial court erred by failing to give instructions on heat of passion and voluntary manslaughter." Jackson alleges that "there was reasonable provocation and that Jackson reacted out of fear." He contends that his testimony that "Robinson threatened Jackson

- 16 -

and made statements making clear he intended to rob Jackson" supported the giving of a heat of passion instruction.

"Where a homicide is committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation, it is not murder, but is [voluntary] manslaughter." *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003) (alteration in original) (quoting *Wilkins v. Commonwealth*, 176 Va. 580, 583 (1940)). "Heat of passion excludes malice when provocation reasonably produces fear that causes one to act on impulse without conscious reflection." *Witherow v. Commonwealth*, 65 Va. App. 557, 567 (2015). "'[W]ords alone, however insulting or contemptuous, are *never* a sufficient provocation' for one to seriously injure or kill another." *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998) (emphasis in original) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)).

Applying these principles to the case now before this Court, we find that the record did not contain a scintilla of evidence supporting a heat of passion instruction. The trial court appropriately considered Jackson's self-serving testimony that Robinson was attempting to rob him "in light of the other undisputed evidence at trial." *Brandau*, 16 Va. App. at 413. The video shows Jackson and Robinson speaking to each other for a few moments. They are not yelling or gesticulating, nor is their interaction actually physical in any way until *Jackson* pulls out the gun and then points it at Robinson. Moreover, even assuming for the sake of argument that Robinson did make the statements that Jackson alleges, those words would be insufficient alone to establish that Robinson adequately provoked Jackson to shoot him. *See Caudill*, 27 Va. App. at 85. In addition, heat of passion is an absolutely necessary element in a conviction for voluntary manslaughter. *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021). So if no heat of passion instruction was necessary, no instruction on voluntary manslaughter was necessary

- 17 -

either.  We therefore do not disturb the trial court's decision refusing Jackson's proposed instructions on heat of passion and voluntary manslaughter.

## B. *Self-Defense*

Jackson alleges that "there was ample evidence to support a jury instruction on self-defense."  He contends that his own testimony, coupled with the video from the bus stop, provided "more than scintilla of evidence that there was reasonable provocation and that Jackson reacted out of fear."  He argues that he thought Robinson's phone was a weapon and that when Robinson removed his hand from his pocket, it was "a gesture consistent with pulling out a weapon of some sort."

"To establish a claim of self-defense, a defendant must show that he reasonably feared death or serious bodily harm at the hands of his victim." *Hines v. Commonwealth*, 292 Va. 674, 679 (2016).  As the Supreme Court has clearly held, a defendant's "'bare fear' of serious bodily injury, or even death, however well-grounded, will not justify the taking of human life." *Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (quoting *Stoneman v. Commonwealth*, 66 Va. (25 Gratt.) 887, 900 (1874)).  "There must [also] be some overt act indicative of imminent danger at the time." *Id.* (alteration in original) (quoting *Vlastaris v. Commonwealth*, 164 Va. 647, 652 (1935)).  "In other words, a defendant 'must wait till some overt act is done[,] . . . till the danger becomes imminent.'" *Id.* (alterations in original) (quoting *Vlastaris*, 164 Va. at 652).

As with heat of passion, the trial court was correct to refuse Jackson's self-defense instruction when viewing his testimony "in light of the other undisputed evidence at trial," such as the video. *Brandau*, 16 Va. App. at 413.  The undisputed evidence showed Robinson approaching the bus stop—in Jackson's direct line of vision.  Robinson was holding his cell phone—not a knife—in his hand, which he then put in his pants pocket.  In any event, even if Jackson's belief that Robinson was carrying a knife was reasonable, "the mere act of reaching

toward a waistband even when coupled with the speculative fear that the reach may be for a weapon, is not sufficient as a matter of law to constitute an overt act that justifies the preemptive use of *deadly force*." *Jones*, 71 Va. App. at 95 (emphasis added). We therefore also do not disturb the judgment of the trial court in refusing Jackson's self-defense jury instruction.[5]

CONCLUSION

For all of the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

---

[5] "Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ('justifiable self-defense') and self-defense with fault ('excusable self-defense')." *Bell v. Commonwealth*, 66 Va. App. 479, 487 (2016). Given that Jackson sought a jury instruction only on justifiable self-defense, we do not reach whether the evidence supported an instruction on excusable self-defense.